

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-8-1996

# United States v. Bd Ed Piscataway

Precedential or Non-Precedential:

Docket 94-5090,94-5112

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"United States v. Bd Ed Piscataway" (1996). *1996 Decisions.* Paper 84.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/84

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
—————————

No. 94-5090
—————————

UNITED STATES OF AMERICA

SHARON TAXMAN, Plaintiff-Intervenor

vs.

BOARD OF EDUCATION OF THE TOWNSHIP OF PISCATAWAY,

Appellant


—————————

No. 94-5112
—————————

SHARON TAXMAN,

Appellant

v.

BOARD OF EDUCATION OF THE TOWNSHIP OF PISCATAWAY
—————————

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 92-cv-00340)
—————————

Argued
November 29, 1995
Before:  SLOVITER,* Chief Judge,
MANSMANN and MCKEE, Circuit Judges.
—————————

Reargued In Banc
May 14, 1996


Before:  SLOVITER, Chief Judge, BECKER, STAPLETON,
MANSMANN, GREENBERG, SCIRICA, COWEN, NYGAARD,
ALITO, ROTH, LEWIS, McKEE and SAROKIN,**
Circuit Judges.

(Filed August 8, 1996)

\*       The Honorable William D. Hutchinson was a member of the original panel which heard argument in this appeal on January 24, 1995.  He died on October 8, 1995, before the appeal was resolved; Chief Judge Sloviter was designated to serve in his place on the reconstituted panel.

\*\*       Judge Sarokin heard argument but retired from office prior to the issuance of the opinion.

David B. Rubin, Esquire (ARGUED)
44 Bridge Street
P.O. Box 4579
Metuchen, NJ    08840

        COUNSEL FOR BOARD OF EDUCATION
         OF THE TOWNSHIP OF PISCATAWAY

Stephen E. Klausner, Esquire (ARGUED)
Klausner, Hunter, Cige & Seid
63 E. High Street
P.O. Box 1012
Somerville, NJ  08876

        COUNSEL FOR SHARON TAXMAN
                 _____

                 OPINION OF THE COURT
                 _____

MANSMANN, Circuit Judge.

        In this Title VII matter, we must determine whether the Board of Education of the Township of Piscataway violated that statute when it made race a factor in selecting which of two equally qualified employees to lay off.  Specifically, we must decide whether Title VII permits an employer with a racially balanced work force to grant a non-remedial racial preference in order to promote "racial diversity".

        It is clear that the language of Title VII is violated when an employer makes an employment decision based upon an employee's race.  The Supreme Court determined in United Steelworkers v. Weber, 443 U.S. 193 (1979), however, that Title VII's prohibition against racial discrimination is not violated by affirmative action plans which first, "have purposes that mirror those of the statute" and second, do not "unnecessarily trammel the interests of the [non-minority] employees," id. at 208.

        We hold that Piscataway's affirmative action policy is unlawful because it fails to satisfy either prong of Weber.  Given the clear antidiscrimination mandate of Title VII, a non-remedial affirmative action plan, even one with a laudable purpose, cannot pass muster.  We will affirm the district court's grant of summary judgment to Sharon Taxman.

I.

In 1975, the Board of Education of the Township of Piscataway, New Jersey, developed an affirmative action policy applicable to employment decisions. The Board's Affirmative Action Program, a 52-page document, was originally adopted in response to a regulation promulgated by the New Jersey State Board of Education. That regulation directed local school boards to adopt "affirmative action programs," N.J. Admin. Code Tit. 6 § 6:4-1.3(b), to address employment as well as school and classroom practices and to ensure equal opportunity to all persons regardless of race, color, creed, religion, sex or national origin. N.J. Admin. Code Tit. 6 §§ 6:4-1.5, 6:4-1.6(a). In 1983 the Board also adopted a one page "Policy", entitled "Affirmative Action - Employment Practices." It is not clear from the record whether the "Policy" superseded or simply added to the "Program," nor does it matter for purposes of this appeal.

The 1975 document states that the purpose of the Program is "to provide equal educational opportunity for students and equal employment opportunity for employees and prospective employees," and "to make a concentrated effort to attract . . . minority personnel for all positions so that their qualifications can be evaluated along with other candidates." The 1983 document states that its purpose is to "ensure[] equal employment opportunity . . . and prohibit[] discrimination in employment because of [,inter alia,] race. . . ."

The operative language regarding the means by which affirmative-action goals are to be furthered is identical in the two documents. "In all cases, the most qualified candidate will be recommended for appointment. However, when candidates appear to be of equal qualification, candidates meeting the criteria of the affirmative action program will be recommended." The phrase "candidates meeting the criteria of the affirmative action program" refers to members of racial, national origin or gender groups identified as minorities for statistical reporting purposes by the New Jersey State Department of Education, including Blacks. The 1983 document also clarifies that the affirmative action program applies to "every aspect of employment including . . . layoffs . . . ."

The Board's affirmative action policy did not have "any remedial purpose"; it was not adopted "with the intention of remedying the results of any prior discrimination or identified underrepresentation of minorities within the Piscataway Public School System." At all relevant times, Black teachers were neither "underrepresented" nor "underutilized" in the Piscataway School District work force. Indeed, statistics in 1976 and 1985 showed that the percentage of Black employees in the job category which included teachers exceeded the percentage of Blacks in the available work force.

A.

In May, 1989, the Board accepted a recommendation from the Superintendent of Schools to reduce the teaching staff in the Business Department at Piscataway High School by one. At that time, two of the teachers in the department were of equal seniority, both having begun their employment with the Board on

the same day nine years earlier.  One of those teachers was intervenor plaintiff Sharon Taxman, who is White, and the other was Debra Williams, who is Black.  Williams was the only minority teacher among the faculty of the Business Department.

Decisions regarding layoffs by New Jersey school boards are highly circumscribed by state law; nontenured faculty must be laid off first, and layoffs among tenured teachers in the affected subject area or grade level must proceed in reverse order of seniority.  N.J. Stat. Ann. § 18A:28-9 et seq.  Seniority for this purpose is calculated according to specific guidelines set by state law.  N.J. Stat. Ann. § 18A:28-10; N.J. Admin. Code Tit. 6 § 6:3-5.1.  Thus, local boards lack discretion to choose between employees for layoff, except in the rare instance of a tie in seniority between the two or more employees eligible to fill the last remaining position.

The Board determined that it was facing just such a rare circumstance in deciding between Taxman and Williams.  In prior decisions involving the layoff of employees with equal seniority, the Board had broken the tie through "a random process which included drawing numbers out of a container, drawing lots or having a lottery."  In none of those instances, however, had the employees involved been of different races.

In light of the unique posture of the layoff decision, Superintendent of Schools Burton Edelchick recommended to the Board that the affirmative action plan be invoked in order to determine which teacher to retain.  Superintendent Edelchick made this recommendation "because he believed Ms. Williams and Ms. Taxman were tied in seniority, were equally qualified, and because Ms. Williams was the only Black teacher in the Business Education Department."

While the Board recognized that it was not bound to apply the affirmative action policy, it made a discretionary decision to invoke the policy to break the tie between Williams and Taxman.  As a result, the Board "voted to terminate the employment of Sharon Taxman, effective June 30, 1988. . . ."

At her deposition, Paula Van Riper, the Board's Vice President at the time of the layoff, described the Board's decision-making process.  According to Van Riper, after the Board recognized that Taxman and Williams were of equal seniority, it assessed their classroom performance, evaluations, volunteerism and certifications and determined that they were "two teachers of equal ability" and "equal qualifications."

At his deposition Theodore H. Kruse, the Board's President, explained his vote to apply the affirmative action policy as follows:

A.   Basically I think because I had been aware that the student body and the community which is our responsibility, the schools of the community, is really quite diverse and there -- I have a general feeling during my tenure on the board that it was valuable for the students to see in the various employment roles a wide range of background, and that it was also valuable to the work force and in

particular to the teaching staff that they have -- they see that in each other.

Asked to articulate the "educational objective" served by retaining Williams rather than Taxman, Kruse stated:

A.   In my own personal perspective I believe by retaining Mrs. Williams it was sending a very clear message that we feel that our staff should be culturally diverse, our student population is culturally diverse and there is a distinct advantage to students, to all students, to be made -- come into contact with people of different cultures, different background, so that they are more aware, more tolerant, more accepting, more understanding of people of all background.

Q.   What do you mean by the phrase you used, culturally diverse?

A.   Someone other than -- different than yourself.  And we have, our student population and our community has people of all different background, ethnic background, religious background, cultural background, and it's important that our school district encourage awareness and acceptance and tolerance and, therefore, I personally think it's important that our staff reflect that too.

## B.

Following the Board's decision, Taxman filed a charge of employment discrimination with the Equal Employment Opportunity Commission.  Attempts at conciliation were unsuccessful, and the United States filed suit under Title VII against the Board in the United States District Court for the District of New Jersey.  Taxman intervened, asserting claims under both Title VII and the New Jersey Law Against Discrimination (NJLAD).

Following discovery, the Board moved for summary judgment and the United States and Taxman cross-moved for partial summary judgment only as to liability.  The district court denied the Board's motion and granted partial summary judgment to the United States and Taxman, holding the Board liable under both statutes for discrimination on the basis of race.  United States v. Board of Educ. of Township Piscataway, 832 F. Supp. 836, 851 (D.N.J. 1993).

A trial proceeded on the issue of damages.  By this time, Taxman had been rehired by the Board and thus her reinstatement was not an issue.  The court awarded Taxman damages in the amount of $134,014.62 for backpay, fringe benefits and prejudgment interest under Title VII.  A jury awarded an additional $10,000 for emotional suffering under the NJLAD.  The district court denied the United States' request for a broadly

worded injunction against future discrimination, finding that there was no likelihood that the conduct at issue would recur, but it did order the Board to give Taxman full seniority reflecting continuous employment from 1980. Additionally, the court dismissed Taxman's claim for punitive damages under the NJLAD.

The Board appealed, contending that the district court erred in granting Taxman summary judgment as to liability. The Board also contends, in the alternative, that the court erred in awarding Taxman 100% backpay and in awarding prejudgment interest at the IRS rate rather than under 28 U.S.C. § 1961. Taxman cross-appealed, contending that the district court erred in dismissing her claim for punitive damages. Subsequently, the United States sought leave to file a brief as amicus curiae in support of reversal of the judgment, representing that it could no longer support the judgment of the district court. By order of November 17, 1995, we denied the United States' request. We treated the position of the United States at the original argument before this court on January 24, 1995, as a motion to withdraw as a party, which we granted. Thus, the only parties before us on this appeal are the Board and Taxman.

This court has jurisdiction over the appeals under 28 U.S.C. § 1291. Our review of the district court's decision on summary judgment is plenary. Waldron v. SL Industries, 56 F.3d 491, 496 (3d Cir. 1995).

II.

In relevant part, Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" or "to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise affect his status as an employee" on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). For a time, the Supreme Court construed this language as absolutely prohibiting discrimination in employment, neither requiring nor permitting any preference for any group. Johnson v. Transportation Agency, Santa Clara County, 480 U.S. 616, 643 (1987) (Stevens, J., concurring) (citing, inter alia, Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971), and McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 280 (1976)).

In 1979, however, the Court interpreted the statute's "antidiscriminatory strategy" in a "fundamentally different way", id. at 644, holding in the seminal case of United Steelworkers v. Weber, 433 U.S. 193 (1979), that Title VII's prohibition against racial discrimination does not condemn all voluntary race-conscious affirmative action plans. In Weber, the Court considered a plan implemented by Kaiser Aluminum & Chemical Corporation. Prior to 1974, Kaiser hired as craftworkers only those with prior craft experience. Id. at 198. Because they had long been excluded from craft unions, Blacks were unable to present the credentials required for craft positions. Id. Moreover, Kaiser's hiring practices, although not admittedly

discriminatory with regard to minorities, were questionable.  Id.at 210.
As a consequence, while the local labor force was about
39% Black, Kaiser's labor force was less than 15% Black and its
crafts-work force was less than 2% Black.  Id. at 198.  In 1974,
Kaiser entered into a collective bargaining agreement which
contained an affirmative action plan.  The plan reserved 50% of
the openings in an in-plant craft-training program for Black
employees until the percentage of Black craft-workers in the
plant reached a level commensurate with the percentage of Blacks
in the local labor force.  Id. at 198.  During the first year of
the plan's operation, 13 craft-trainees were selected, seven of
whom were Black and six of whom were White.  Id. at 199.

Thereafter, Brian Weber, a White production worker,
filed a class action suit, alleging that the plan unlawfully
discriminated against White employees under Title VII.  Relying
upon a literal reading of subsections 2000-3(2)(a) and (d) of
the Act, 42 U.S.C. S 2000e-2(a), (d), and upon the Court's
decision in McDonald v. Santa Fe Trail Transp. Co., 427 U.S. at
273, where the Court held that Title VII forbids discrimination
against Whites as well as Blacks, the plaintiffs argued that it
necessarily followed that the Kaiser plan, which resulted in
junior Black employees receiving craft training in preference to
senior White employees, violated Title VII.  Id. at 199.  The
district court agreed and entered a judgment in favor of the
plaintiffs; the Court of Appeals for the Fifth Circuit affirmed.
Id. at 200.

The Supreme Court, however, reversed, noting initially
that although the plaintiffs' argument was not "without force",
it disregarded "the significance of the fact that the Kaiser-USWA
plan was an affirmative action plan voluntarily adopted by
private parties to eliminate traditional patterns of racial
segregation."  Id. at 201.  The Court then embarked upon an
exhaustive review of Title VII's legislative history and
identified Congress' concerns in enacting Title VII's prohibition
against discrimination -- the deplorable status of Blacks in the
nation's economy, racial injustice, and the need to open
employment opportunities for Blacks in traditionally closed
occupations.  Id. at 202-204.  Against this background, the Court
concluded that Congress could not have intended to prohibit
private employers from implementing programs directed toward the
very goal of Title VII -- the eradication of discrimination and
its effects from the workplace:

> It would be ironic indeed if a law triggered
> by a Nation's concern over centuries of
> racial injustice and intended to improve the
> lot of those who had "been excluded from the
> American dream for so long," 110 Cong. Rec.
> 6552 (1964) (remarks of Sen. Humphrey),
> constituted the first legislative prohibition
> of all voluntary, private, race-conscious
> efforts to abolish traditional patterns of
> racial segregation and hierarchy.

Id. at 204.

The Court found support for its conclusion in the language and legislative history of section 2000e-2(j) of Title VII which expressly provides that nothing in the Act requires employers to grant racial preferences. According to the Court, the opponents of Title VII had raised two arguments:  the Act would be construed to impose obligations upon employers to integrate their work forces through preferential treatment of minorities, and even without being obligated to do so, employers with racially imbalanced work forces would grant racial preferences.  Id. at 205.  Since Congress addressed only the first objection and did not specifically prohibit affirmative action efforts in section 2000e-2(j), the Court inferred that Congress did not intend that Title VII forbid all voluntary race-conscious preferences.  Id. at 205-06.  The Court further reasoned that since Congress also intended in section 2000e-2(j) "to avoid undue federal regulation of private businesses," a prohibition against all voluntary affirmative action would disserve this end by "augment[ing] the power of the Federal government and diminish[ing] traditional management prerogatives. . . ."  Id. at 206-07.

The Court then turned to the Kaiser plan in order to determine whether it fell on the "permissible" side of the "line of demarcation between permissible and impermissible affirmative action plans."  Id. at 208.  The Court upheld the Kaiser plan because its purpose "mirror[ed] those of the statute" and it did not "unnecessarily trammel the interests of the [non-minority] employees":

> The purposes of the plan mirror those of the statute.  Both were designed to break down old patterns of racial segregation and hierarchy.  Both were structured to "open employment opportunities for Negroes in occupations which have been traditionally closed to them."  110 Cong. Rec. 6548 (1964) (remarks of Sen. Humphrey).
>
> At the same time, the plan does not unnecessarily trammel the interests of the white employees.  The plan does not require the discharge of white workers and their replacement with new black hires.  Nor does the plan create an absolute bar to the advancement of white employees; half of those trained in the program will be white.  Moreover, the plan is a temporary measure; it is not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance.

Id. at 208 (citation and footnote omitted).

In 1987, the Supreme Court decided a second Title VII affirmative action case, Johnson v. Transportation Agency, Santa Clara County, 480 U.S. at 616.  There, the Santa Clara County Transit District Board of Supervisors implemented an affirmative

action plan stating that "`mere prohibition of discriminatory practices [was] not enough to remedy the effects of past discriminatory practices and to permit attainment of an equitable representation of minorities, women and handicapped persons.'" Id. at 620. The plan noted that women were represented in numbers far less than their proportion of the available work force in the Agency as a whole and in the skilled craft worker job category relevant to the case, and observed that a lack of motivation in women to seek training or employment where opportunities were limited partially explained the underrepresentation. Id. at 621. The plan authorized the Agency to consider as one factor the gender of a qualified candidate in making promotions to positions with a traditionally segregated job classification in which women were significantly underrepresented. Id. at 620-21. The plan did not set quotas, but had as its long-term goal the attainment of a work force whose composition reflected the proportion of women in the area labor force. Id. at 621-22. Acknowledging the practical difficulties in attaining the long-term goal, including the limited number of qualified women, the plan counseled that short-range goals be established and annually adjusted to serve as realistic guides for actual employment decisions. Id. at 622.

On December 12, 1979, the Agency announced a vacancy for the promotional position of road dispatcher. At the time, none of the 238 positions in the applicable job category was occupied by a woman. Id. at 621. The Agency Director, authorized to choose any of seven applicants who had been deemed eligible, promoted Diane Joyce, a qualified woman, over Paul Johnson, a qualified man. Id. at 624-25. As the Agency Director testified: "`I tried to look at the whole picture, the combination of her qualifications and Mr. Johnson's qualifications, their test scores, their expertise, their background, affirmative action matters, things like that . . . I believe it was a combination of all those.'" Id. at 625.

Johnson sued, alleging that the Agency's employment decision constituted unlawful sex discrimination under Title VII. Evaluating the plan against the criteria announced in Weber, the district court held that the plan did not satisfy Weber's criterion that the plan be temporary. Id. at 625. The Court of Appeals for the Ninth Circuit reversed, holding that since the plan provided for the attainment, rather than the maintenance, of a balanced work force, the absence of an express termination date in the plan was not dispositive of its validity. Id. at 625-26. The court of appeals further held that the plan had been adopted "to address a conspicuous imbalance in the Agency's work force, and neither unnecessarily trammeled the rights of other employees, nor created an absolute bar to their advancement." Id. at 626.

The Supreme Court affirmed. Declaring its prior analysis in Weber controlling, the Court examined whether the employment decision at issue "was made pursuant to a plan prompted by concerns similar to those of the employer in Weber" and whether "the effect of the [p]lan on males and nonminorities

[was] comparable to the effects of the plan in that case."  Id.at 631.
The first issue the Court addressed, therefore, was
whether "consideration of the sex of applicants for Skilled Craft
jobs was justified by the existence of a `manifest imbalance'
that reflected underrepresentation of women in `traditionally
segregated job categories.'"  Id. at 631 (quoting Weber, 433 U.S.
at 197).  Although the Court did not set forth a quantitative
measure for determining what degree of disproportionate
representation in an employer's work force would be sufficient to
justify affirmative action, it made clear that the terms
"manifest imbalance" and "traditionally segregated job category"
were not tantamount to a prima facie case of discrimination
against an employer since the constraints of Title VII and the
Federal Constitution on voluntarily adopted affirmative action
plans are not identical.  Johnson, 480 U.S. at 632.  In this
regard, the Court further reasoned that requiring an employer in
a Title VII affirmative action case to show that it had
discriminated in the past "would be inconsistent with Weber's
focus on statistical imbalance, and could inappropriately create
a significant discentive for employers to adopt an affirmative
action plan".  Id. at 633 (footnote omitted).

     Reviewing Agency statistics which showed that women
were concentrated in traditionally female jobs and represented a
lower percentage in other jobs than would be expected if
traditional segregation had not occurred, the Court concluded
that the decision to promote Joyce was made pursuant to a plan
designed to eliminate work force imbalances in traditionally
segregated job categories and thus satisfied Weber's first prong.
Id. at 634.  Moving to Weber's second prong, whether the plan
unnecessarily trammeled the rights of male employees, the Court
concluded that the plan passed muster because it authorized
merely that consideration be given to affirmative action concerns
when evaluating applicants; gender was a "plus" factor, only one
of several criteria that the Agency Director considered in making
his decision; no legitimate, firmly rooted expectation on the
part of Johnson was denied since the Agency Director could have
promoted any of the seven candidates classified as eligible; even
though Johnson was refused a promotion, he retained his
employment; and the plan was intended to attain a balanced work
force, not to maintain one.  Id. at 638-40.

### III.

     We analyze Taxman's claim of employment discrimination
under the approach set forth in McDonnell Douglas v. Green, 411
U.S. 792 (1978).  Once a plaintiff establishes a prima faciecase, the
burden of production shifts to the employer to show a
legitimate nondiscriminatory reason for the decision; an
affirmative action plan may be one such reason.  Johnson v.
Transportation Agency, Santa Clara County, 480 U.S. 616, 626
(1987).  When the employer satisfies this requirement, the burden
of production shifts back to the employee to show that the
asserted nondiscriminatory reason is a pretext and that the
affirmative action plan is invalid.  Id.
     For summary judgment purposes, the parties do not

dispute that Taxman has established a prima facie case or that the Board's decision to terminate her was based on its affirmative action policy. The dispositive liability issue, therefore, is the validity of the Board's policy under Title VII.

IV.

Having reviewed the analytical framework for assessing the validity of an affirmative action plan as established in United Steelworkers v. Weber, 443 U.S. 193 (1979), and refined in Johnson, 490 U.S. at 616, we turn to the facts of this case in order to determine whether the racial diversity purpose of the Board's policy mirrors the purposes of the statute. We look for the purposes of Title VII in the plain meaning of the Act's provisions and in its legislative history and historical context. See Edward v. Aguillard, 482 U.S. 578, 594-95 (1987) (in determining a statute's purpose, courts look to the statute's words, legislative history, historical context and the sequence of events leading to its passage).

A.

Title VII was enacted to further two primary goals: to end discrimination on the basis of race, color, religion, sex or national origin, thereby guaranteeing equal opportunity in the workplace, and to remedy the segregation and underrepresentation of minorities that discrimination has caused in our Nation's work force.

Title VII's first purpose is set forth in section 2000e-2's several prohibitions, which expressly denounce the discrimination which Congress sought to end. 42 U.S.C. § 2000e-2(a)-(d),(l); McDonnell Douglas, 411 U.S. at 800 ("The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens."). This antidiscriminatory purpose is also reflected in the Act's legislative history. In an interpretative memorandum entered into the Congressional Record, Senators Case and Clark, comanagers of the Senate bill, stated:

> To discriminate is to make a distinction, to make a difference in treatment or favor, and those distinctions or differences in treatment or favor which are prohibited by section 704 are those which are based on any five of the forbidden criteria: race, color, religion, sex, and national origin. Any other criterion or qualification for employment is not affected by this title.

> * * *

> . . . [Title VII] expressly protects the employer's right to insist that any prospective applicant, Negro or white, must meet the applicable job qualifications.

> Indeed the very purpose of Title VII is to
> promote hiring on the basis of job
> qualifications, rather than on the basis of
> race or color.

110 Cong. Rec. 7213, 7247 (1964), quoted in Price Waterhouse v. Hopkins, 490 U.S. 228, 243 (1989).

Title VII's second purpose, ending the segregative effects of discrimination, is revealed in the congressional debate surrounding the statute's enactment.  In Weber, the Court carefully catalogued the comments made by the proponents of Title VII which demonstrate the Act's remedial concerns.  Weber, 433 U.S. at 202-04.  By way of illustration, we cite Senator Clark's remarks to the Senate:

> The rate of Negro unemployment has gone up
> consistently as compared with white
> unemployment for the past 15 years.  This is
> a social malaise and a social situation which
> we should not tolerate.  That is one of the
> principal reasons why the bill should pass.

Id. (quoting 110 Cong. Rec. at 7220) (statement of Sen. Clark). Likewise, Senator Humphrey spoke of the Nation's need "`to open employment opportunities for Negroes which have been traditionally closed to them,'" and to assist those who have "`been excluded from the American dream for so long[.]'"  Id.(quoting 110 Cong. Rec. at 6548, 6552) (statements of Sen. Humphrey).

The significance of this second corrective purpose cannot be overstated.  It is only because Title VII was written to eradicate not only discrimination per se but the consequencesof prior discrimination as well, that racial preferences in the form of affirmative action can co-exist with the Act's antidiscrimination mandate.

Thus, based on our analysis of Title VII's two goals, we are convinced that unless an affirmative action plan has a remedial purpose, it cannot be said to mirror the purposes of the statute, and, therefore, cannot satisfy the first prong of the Weber test.

We see this case as one involving straightforward statutory interpretation controlled by the text and legislative history of Title VII as interpreted in Weber and Johnson.  The statute on its face provides that race cannot be a factor in employer decisions about hires, promotions, and layoffs, and the legislative history demonstrates that barring considerations of race from the workplace was Congress' primary objective.  If exceptions to this bar are to be made, they must be made on the basis of what Congress has said.  The affirmative action plans at issue in Weber and Johnson were sustained only because the Supreme Court, examining those plans in light of congressional intent, found a secondary congressional objective in Title VII that had to be accommodated -- i.e., the elimination of the effects of past discrimination in the workplace.  Here, there is no congressional recognition of diversity as a Title VII

objective requiring accommodation.

Accordingly, it is beyond cavil that the Board, by invoking its affirmative action policy to lay off Sharon Taxman, violated the terms of Title VII. While the Court in Weber and Johnson permitted some deviation from the antidiscrimination mandate of the statute in order to erase the effects of past discrimination, these rulings do not open the door to additional non-remedial deviations. Here, as in Weber and Johnson, the Board must justify its deviation from the statutory mandate based on positive legislative history, not on its idea of what is appropriate.

B.

The Board recognizes that there is no positive legislative history supporting its goal of promoting racial diversity "for education's sake", and concedes that there is no caselaw approving such a purpose to support an affirmative action plan under Title VII. "[T]he Board would have [us] infer the propriety of this purpose from fragments of other authority." Board of Educ. of Township of Piscataway, 832 F. Supp. at 845.

The Board first attempts to meet its obligations with respect to Title VII by arguing that Congress meant to cover the situation presented here "when it amended Title VII in 1972 to cover academic institutions public and private." A review of a Senate Committee's explanation for recommending the amendment, however, reveals that Congress neither addressed nor embraced the racial diversity purpose before us. Instead, Congress pursued, in Title VII's 1972 amendment with regard to the nation's schools, the same purposes it had pursued in 1964 when enacting the original statute with respect to other employers, namely, the elimination of discriminatory employment practices and the abolition of discrimination's invidious effects:

> The presence of discrimination in the Nation's educational institutions is no secret. . . . This discrimination, however, is not limited to the students alone. Discriminatory practices against faculty, staff, and other employees is also common.

> As in other areas of employment, statistics for educational institutions indicate that minorities and women are precluded from the more prestigious and higher-paying positions, and are relegated to the more menial and lower-paying jobs. While in elementary and secondary school systems Negroes accounted for approximately 10% of the total number of positions in the higher-paying and more prestigious positions in institutions of higher learning, blacks constituted only 2.2% of all positions, most of these being found in all-black or predominantly black institutions. Women are similarly subject to discriminatory patterns.

Not only are they generally under-represented in institutions of higher learning, but those few that do obtain positions are generally paid less and advanced more slowly than their male counterparts.  Similarly, while women constitute 67% of elementary and secondary school teachers, out of 778,000 elementary and secondary school principals, 78% of elementary school principals are men and 94% of secondary school principals are men.

. . .  There is nothing in the legislative background of Title VII, nor does any national policy suggest itself, to support the present exemption.  In fact, the Committee believes that the existence of discrimination in educational institutions is particularly critical.  It is difficult to imagine a more sensitive area than educational institutions, where the youth of the Nation are exposed to a multitude of ideas and impressions that will strongly influence their future development.  To permit discrimination here would, more than in any other area, tend to promote existing misconceptions and stereotypical categorizations which in turn would lead to future patterns of discrimination.

S.Rep. 415, 92nd Cong., 1st Sess. 12 (1971).  See Johnson, 480 U.S. at 627-28 n.6 ("While public employers were not added to the definition of `employer' in Title VII until 1972, there is no evidence that this mere addition to the definitional section of the statute was intended to transform the substantive standard governing employer conduct.").

We find the Board's reliance on Fourteenth Amendment caselaw misplaced as well.  We are acutely aware, as is the Board, that the federal courts have never decided a "pure" Title VII case where racial diversity for education's sake was advanced as the sole justification for a race-based decision.  The Board argues that in deciding just such a case, we should look to the Supreme Court's endorsement of diversity as a goal in the Equal Protection context.  This argument, however, is based upon a faulty premise.

In relying on Equal Protection cases to support its diversity goal, we understand the Board to reason as follows: The Supreme Court observed in Johnson that "the statutory prohibition [in Title VII] with which an employer must contend was not intended to extend as far as that of the Constitution", 480 U.S. at 628 n.6.  Accordingly, a purpose which survives constitutional strict scrutiny necessarily passes muster under Title VII's permissible purpose test -- since the Court has endorsed the concept of diversity in Equal Protection cases, it would approve the Board's diversity purpose in this Title VII

case, where the limitations on purpose are less stringent.

We are convinced, however, that Johnson's footnote six, 480 U.S. at 627-28 n.6, in which the Court contrasted the reach of Title VII with that of the Constitution, does not speak to the purposes that may support affirmative action under the former but not the latter. We read the Court's observation to relate, instead, to the factual predicate that employers must offer to prove the need for remedial efforts in Title VII as contrasted with Equal Protection affirmative action cases.

In Johnson, the Court held that the legality of the Santa Clara County Transportation Agency's plan under Title VII must be guided by the Court's determination in Weber that affirmative action is lawful if an employer can point to a "`manifest imbalance . . . in traditionally segregated job categories.'" 480 U.S. at 630-32 (quoting Weber, 433 U.S. at 197). In Wygant v. Jackson Board of Education, 476 U.S. 267 (1986), by contrast, the Court determined that under the Constitution a public employer's remedial affirmative action initiatives are valid only if crafted to remedy its own past or present discrimination; that is, societal discrimination is an insufficient basis for "imposing discretionary legal remedies against innocent people." Id. at 274-76. In the plurality's words, affirmative action must be supported by "a factual determination that the employer had a strong basis in evidence for its conclusion that remedial action was necessary." Id. at 277.

When the Court in Johnson observed that Title VII's statutory prohibition does not extend as far as the Constitution, it was addressing one of Justice Scalia's arguments in dissent that since obligations under Title VII and the Constitution are identical, a public employer's adoption of an affirmative action plan in a Title VII case should be governed by the prior discrimination standard set forth in Wygant. Johnson, 480 U.S. at 627-28 n.6.

While the Supreme Court may indeed at some future date hold that an affirmative action purpose that satisfies the Constitution must necessarily satisfy Title VII, it has yet to do so.

Were we to accept that equal protection standards may be imported into Title VII analysis, we are still unpersuaded that the Equal Protection caselaw validates the Board's asserted goal of racial diversity. We cannot agree with the Board that the racial diversity purpose is supported by both the Supreme Court's holding and the dissenting opinions in Wygant. The Court in Wygant, although divided, agreed that under the Equal Protection Clause, racial classifications in the context of affirmative action must be justified by a compelling state purpose and the means chosen to effectuate that purpose must be narrowly tailored; that societal discrimination alone will not justify a racial classification; that evidence of prior discrimination by an employer must be presented before remedial racial classifications can be employed; and that the "role model" theory proposed by the employer as a basis for race-conscious

state action was unacceptable because it would have allowed discriminatory hiring and layoff well beyond the point necessary for any remedial purpose and did not bear any relationship to the harm caused by prior discrimination. Id. at 270-78; id. at 284-93 (O'Connor, J., concurring in part and concurring in the Court's judgment); id. at 294-95 (White, J., concurring in the Court's judgment). The dissenting Justices believed that the Constitution would allow a public employer to preserve the integration it had achieved through a legitimate affirmative action hiring plan by thereafter apportioning layoffs between minority and nonminority groups. Id. at 306 (Marshall, J., dissenting, joined by Brennan and Blackmun, JJ.); id. at 267-68 (Stevens, J., dissenting).

We are also unpersuaded by the Board's contention that Equal Protection cases arising in an education context support upholding the Board's purpose in a Title VII action. These Equal Protection cases, unlike the case at hand, involved corrective efforts to confront racial segregation or chronic minority underrepresentation in the schools. In this context, we are not at all surprised that the goal of diversity was raised. While we wholeheartedly endorse any statements in these cases extolling the educational value of exposing students to persons of diverse races and backgrounds, given the framework in which they were made, we cannot accept them as authority for the conclusion that the Board's non-remedial racial diversity goal is a permissible basis for affirmative action under Title VII. See, e.g., Wygant, 476 U.S. at 267 (Marshall, J., dissenting) (noting that the racially-conscious layoff provision at issue was aimed at preserving the faculty integration achieved by the Jackson, Michigan Public Schools in the early 1970s through affirmative action; minority representation went from 3.9% in 1969 to 8.8% in 1971); Columbus Board of Education v. Penick, 443 U.S. 449, 467 (1979) (condemning intentional segregation and the creation of racially-identifiable schools practiced by the Columbus, Ohio Board of Education); Regents of the University of California v. Bakke, 438 U.S. 265, 272 (1978) (Powell, J., announcing the judgment of the Court) (observing that the 1968 class of the Medical School of the University of California at Davis contained three Asians, no Blacks, no Mexican-Americans and no American Indians); Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1 (1971) (observing that 14,000 Black pupils in the Charlotte-Mecklenburg, North Carolina school system attended 21 schools that were at least 99% Black); Kromnick v. School Dist. of Philadelphia, 739 F.2d 894, 897 (3d Cir. 1984) (recognizing that "[t]he Philadelphia School System has long suffered from defacto segregation by race of students and faculty"), cert.denied, 469 U.S. 1107 (1985).

More specifically, two Supreme Court cases upon which the Board relies, Bakke, 438 U.S. at 265, and Metro Broadcasting Inc. v. FCC, 497 U.S. 547 (1990), are inapposite. Bakke involved a rejected White applicant's challenge under the Constitution and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, to a special admissions program instituted by the Medical School of the University of California at Davis which essentially set aside

16 places for minority candidates.  Justice Powell, whose vote was necessary both to establish the validity of considering race in admission decisions and to invalidate the racial quota before the Court, was of the opinion that the attainment of a "diverse student body" is a constitutionally permissible goal for an institution of higher education.  Justice Powell pointed out that the academic freedom that has been viewed as a "special concern" of the First Amendment includes "the freedom of a university to make its own judgments as to the selection of its student body" and that "[t]he atmosphere of `speculation, experiment and creation' -- so essential to the quality of higher education -- is widely believed to be promoted by a diverse student body." Bakke, 438 U.S. at 312 (footnote omitted).  He then agreed with Davis' assertion that its interest in diversity implicated First Amendment concerns:

> Thus, in arguing that its universities must be accorded the right to select those students who will contribute the most to the "robust exchange of ideas," [Davis] invokes a countervailing constitutional interest, that of the First Amendment.  In this light, petitioner must be viewed as seeking to achieve a goal that is of paramount importance in the fulfillment of its mission.

Id. at 313.

Davis' reservation of a specified number of seats in each class for individuals from preferred ethnic groups to further its diversity purpose, however, was unacceptable because, according to Justice Powell, it misconceived the nature of the state interest that would justify consideration of race or ethnic background:

> It is not an interest in simple ethnic diversity, in which a specified percentage of the student body is in effect guaranteed to be members of selected ethnic groups, with the remaining percentage an undifferentiated aggregation of students.  The diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element.  Davis' special admissions program, focused solely on ethnic diversity, would hinder rather than further attainment of genuine diversity.

Id. at 315 (footnote omitted).

Bakke's factual and legal setting, as well as the diversity that universities aspire to in their student bodies, are, in our view, so different from the facts, relevant law and the racial diversity purpose involved in this case that we find little in Bakke to guide us.

Likewise, statements regarding the value of programming

diversity made by the Court in Metro Broadcasting when it upheld two minority preference policies adopted by the Federal Communications Commission, 497 U.S. at 547, have no application here. The diversity interest the Court found sufficient under the Constitution to support a racial classification had nothing whatsoever to do with the concerns that underlie Title VII. Citing Bakke, the Court concluded that "[j]ust as a `diverse student body' contributing to a `robust exchange of ideas' is a `constitutionally permissible goal' on which a race-conscious university admissions program may be predicated, the diversity of views and information on the airwaves serves important First Amendment values." Id. at 568 (citation omitted).

Finally, we turn to the Board's argument that the diversity goal underlying its application of the affirmative action policy was endorsed in Justice O'Connor's concurring opinion in Wygant and in Justice Stevens' concurring opinion in Johnson. We find that these statements are slender reeds indeed and any bearing that they may have in the situation presented here is minimal. While Justice O'Connor did refer favorably to Bakke and the notion of racial diversity in institutions of higher learning, Wygant, 480 U.S. at 286 (O'Connor J. concurring), just one year later in Johnson, a Title VII case, she rejected Justice Steven's expansive view of the purposes that may underlie affirmative action, stating: "[C]ontrary to the intimations in JUSTICE STEVENS' concurrence, this Court did not approve preferences for minorities `for any reason that might seem sensible from a business or social point of view.'" Johnson, 480 U.S. at 649 (O'Connor, J., concurring in the Court's judgment). As for Justice Stevens' concurrence in Johnson, while he clearly pondered the idea of "forward-looking" affirmative action where employers do not focus on "`purg[ing] their own past sins of discrimination'", id. at 647 (Stevens, J., concurring), his comments are not controlling.

V.

Since we have not found anything in the Board's arguments to convince us that this case requires examination beyond statutory interpretation, we return to the point at which we started: the language of Title VII itself and the two cases reviewing affirmative action plans in light of that statute. Our analysis of the statute and the caselaw convinces us that a non-remedial affirmative action plan cannot form the basis for deviating from the antidiscrimination mandate of Title VII.

The Board admits that it did not act to remedy the effects of past employment discrimination. The parties have stipulated that neither the Board's adoption of its affirmative action policy nor its subsequent decision to apply it in choosing between Taxman and Williams was intended to remedy the results of any prior discrimination or identified underrepresentation of Blacks within the Piscataway School District's teacher workforce as a whole. Nor does the Board contend that its action here was directed at remedying any de jure or de facto segregation. Butsee Piscataway Township Bd. of Educ. v. Burke, 386 A.2d 439 (N.J. Super. Ct. App. Div.), appeal dismissed, 401 A.2d 230 (N.J.

1978). Even though the Board's race-conscious action was taken to avoid what could have been an all-White faculty within the Business Department, the Board concedes that Blacks are not underrepresented in its teaching workforce as a whole or even in the Piscataway High School.

Rather, the Board's sole purpose in applying its affirmative action policy in this case was to obtain an educational benefit which it believed would result from a racially diverse faculty. While the benefits flowing from diversity in the educational context are significant indeed, we are constrained to hold, as did the district court, that inasmuch as "the Board does not even attempt to show that its affirmative action plan was adopted to remedy past discrimination or as the result of a manifest imbalance in the employment of minorities," 832 F. Supp. at 845, the Board has failed to satisfy the first prong of the Weber test. United States v. Board of Educ. of Township of Piscataway, 832 F. Supp. 836, 848 (D.N.J. 1993).

We turn next to the second prong of the Weber analysis. This second prong requires that we determine whether the Board's policy "unnecessarily trammel[s] . . . [nonminority] interests. . . ." Weber, 433 U.S. at 208. Under this requirement, too, the Board's policy is deficient.

We begin by noting the policy's utter lack of definition and structure. While it is not for us to decide how much diversity in a high school facility is "enough," the Board cannot abdicate its responsibility to define "racial diversity" and to determine what degree of racial diversity in the Piscataway School is sufficient.

The affirmative action plans that have met with the Supreme Court's approval under Title VII had objectives, as well as benchmarks which served to evaluate progress, guide the employment decisions at issue and assure the grant of only those minority preferences necessary to further the plans' purpose. Johnson, 480 U.S. at 621-22 (setting forth long-range and short-term objectives to achieve "`a statistically measurable yearly improvement in hiring, training and promotion of minorities and women . . . in all major job classifications where they are underrepresented'"); Weber, 433 U.S. at 193 (reserving for Black employees 50% of the openings in craft-training programs until the percentage of Black craftworkers reflected the percentage of Blacks in the available labor force). By contrast, the Board's policy, devoid of goals and standards, is governed entirely by the Board's whim, leaving the Board free, if it so chooses, to grant racial preferences that do not promote even the policy's claimed purpose. Indeed, under the terms of this policy, the Board, in pursuit of a "racially diverse" work force, could use affirmative action to discriminate against those whom Title VII was enacted to protect. Such a policy unnecessarily trammels the interests of nonminority employees.

Moreover, both Weber and Johnson unequivocally provide that valid affirmative action plans are "temporary" measures that seek to "'attain'", not "maintain" a "permanent racial . . . balance." Johnson, 480 U.S. at 639-40. See Weber, 433 U.S. at 208. The Board's policy, adopted in 1975, is an established

fixture of unlimited duration, to be resurrected from time to time whenever the Board believes that the ratio between Blacks and Whites in any Piscataway School is skewed. On this basis alone, the policy contravenes Weber's teaching. See Cunico v. Pueblo School Dist. No. 60, 917 F.2d 431, 440 (10th Cir. 1990) (holding that the school district's layoff decision aimed at ensuring the employment of the district's only Black administrator was "outright racial balancing" in violation of Weber's second prong).

Finally, we are convinced that the harm imposed upon a nonminority employee by the loss of his or her job is so substantial and the cost so severe that the Board's goal of racial diversity, even if legitimate under Title VII, may not be pursued in this particular fashion. This is especially true where, as here, the nonminority employee is tenured. In Weberand Johnson, when considering whether nonminorities were unduly encumbered by affirmative action, the Court found it significant that they retained their employment. Weber, 433 U.S. at 208 (observing that the plan did not require the discharge of nonminority workers); Johnson, 480 U.S. at 638 (observing that the nonminority employee who was not promoted nonetheless kept his job). We, therefore, adopt the plurality's pronouncement in Wygant that "[w]hile hiring goals impose a diffuse burden, often foreclosing only one of several opportunities, layoffs impose the entire burden of achieving racial equality on particular individuals, often resulting in serious disruption of their lives. That burden is too intrusive." Wygant, 476 U.S. at 283 (footnote omitted).

Accordingly, we conclude that under the second prong of the Weber test, the Board's affirmative action policy violates Title VII. In addition to containing an impermissible purpose, the policy "unnecessarily trammel[s] the interests of the [nonminority] employees." Weber, 430 U.S. at 208.

VI.

The district court did not analyze Taxman's claims based on the New Jersey Law Against Discrimination and we need not do so in detail here. The parties have agreed that the legal analysis required by the state statute is essentially the same as that undertaken in Title VII cases. While the New Jersey Supreme Court has yet to consider a voluntarily adopted affirmative action plan in light of the NJLAD, it is undisputed that the NJLAD has been interpreted to parallel Title VII. In Peper v. Princeton Univ. Bd. of Trustees, 389 A.2d 465, 478 (N.J. 1978), the Supreme Court of New Jersey wrote that "where [Title VII] standards are useful and fair, it is in the best interests of everyone concerned to have some uniformity in the law."

Given that statement, we predict that the New Jersey Supreme Court would follow the analytical directive of Weber and Johnson. Analysis of this case under the NJLAD would, therefore, lead to the same result as that which we have reached under Title VII. Sharon Taxman is entitled to summary judgment on her claim made under the NJLAD.

## VII.

Having found the Board liable under Title VII, we turn our attention to the issue of damages, addressing first the district court's order that Taxman be awarded one hundred percent backpay for the entire period of her layoff. The Board argues that where a backpay award is appropriate, the court's goal should be to restore "`the conditions and relationships that would have been had there been no'" unlawful discrimination. Teamsters v. United States, 431 U.S. 324, 371 (1977) (quoting Franks v. Bowman Transportation Co., 424 U.S. 747, 769 (1976)). According to the Board, the district court's award of one hundred percent backpay was plainly unfair. Had it not invoked the affirmative action plan, the Board would have followed its usual procedure, using a coin toss or other random process to break the seniority between Williams and Taxman. Taxman, therefore, would have stood no more than a fifty percent chance of keeping her job had there been no unlawful discrimination."

We disagree. In deciding backpay issues, a district court has wide latitude to "locate `a just result'" and to further the "make whole remedy of Title VII in light of the circumstances of a particular case." Albemarle Paper Co. v. Moody, 422 U.S. 405, 424-25 (1975). While Taxman cannot be returned to the position that she held prior to her layoff -- one of virtually precise equality with Williams in terms of the factors relevant to the decision -- she can be returned to a position of financial equality with Williams through a one hundred percent backpay award. We are convinced that this award most closely approximates the conditions that would have prevailed in the absence of discrimination.

We find an additional basis for our holding in the analysis set forth in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). In that case, the Supreme Court held that where an employee proves that discrimination played a role in an employment decision, the employer will not be found "liable if it can prove that, even if it had not taken [race] into account it would have come to the same decision regarding a particular person." Id. at 242. Here, Taxman has clearly established that the Board is liable and that she was not paid during the relevant period. Under the logic of Hopkins, the Board cannot avoid a one hundred percent backpay award unless it can establish, by a preponderance of the evidence, that Taxman would have received some lesser amount had the Board not taken race into account. This, of course, the Board cannot do.

Given the law and the circumstances presented in this case, we are convinced that the district court's analysis with respect to backpay reflects the sound exercise of judicial discretion and we will affirm the award.

The Board further contends that the district court erred in calculating prejudgment interest using the IRS adjusted prime rate. According to the Board, the district court should have applied the post-judgment rate set forth in 28 U.S.C. § 1961(a). This argument is meritless.

The matter of prejudgment interest is left to the discretion of the district court. Although a court "may" use the

post-judgment standards of 28 U.S.C. § 1961(a), Sun Ship, Inc. v. Matson Navigation Co., 785 F.2d 59, 63 (3d Cir. 1986), it is not compelled to do so. E.E.O.C. v. Wooster Brush Co. Employees Relief Ass'n., 727 F.2d 566, 579 (1984). The adjusted prime rate, established periodically by the Secretary of the Treasury and codified in 26 U.S.C. § 6621, has been used regularly by district courts to calculate prejudgment interest. See, e.g., E.E.O.C. v. Erie County, 751 F.2d 79, 82 (1984) (trial court did not abuse its discretion in using adjusted prime rate to calculate the amount of prejudgment interest to be paid on backpay award under the Equal Pay Act).

We thus hold that the district court's calculation of pre-judgment interest was consistent with the sound exercise of judicial discretion.

Finally, in her cross-appeal, Taxman asks that we find that the district court erred in dismissing her claim for punitive damages under the NJLAD.

At a January 5, 1994 proceeding devoted to the issue of damages, the district court reaffirmed a decision made at a pretrial conference to "strike the punitive damages claim" on the ground that "there is no evidence to support [it]." (App. at 209). The court made the following comment with respect to punitive damages:

> I didn't say I felt the board -- I may have said that the board acted in good faith, but I think what I did say is that there's no evidence that would support any claim for punitive damages. And I struck the punitive damages claim.
>
> There's absolutely no evidence that the board acted willfully, wantonly, outrageously or in any other way than trying its best to make the best of a very unhappy situation.

The New Jersey Supreme Court has established a high threshold requirement which must be met before an award of punitive damages can be sustained. Punitive damages are to be awarded only "`when the wrongdoer's conduct is especially egregious.'" Rendine v. Pantzer, 141 N.J. 292, 313, 661 A.2d 1201, 1215 (1995). "To warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an `evil-minded' act accompanied by a wanton and willful disregard to the rights of another. . . . The key to the right to punitive damages is the wrongfulness of the intentional action." Id. "[The New Jersey] case indicates that the requirement [of willfulness or wantonness] may be satisfied a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference or consequences.'" Id. (citation omitted). "[The New Jersey courts have] stated that proof of actual malice [is] "`a condition precedent to a punitive damages award.'" Id. (citation omitted).

Having examined the record evidence in this case

against the background of the New Jersey punitive damages standard, we agree with the district court that the evidence would not support a finding that the Board acted willfully, wantonly or outrageously in dismissing Taxman. We conclude, therefore, that Taxman's claim for punitive damages was properly dismissed.

                                VIII.
            While we have rejected the argument that the Board's non-remedial application of the affirmative action policy is consistent with the language and intent of Title VII, we do not reject in principle the diversity goal articulated by the Board. Indeed, we recognize that the differences among us underlie the richness and strength of our Nation. Our disposition of this matter, however, rests squarely on the foundation of Title VII. Although we applaud the goal of racial diversity, we cannot agree that Title VII permits an employer to advance that goal through non-remedial discriminatory measures.
            Having found that the district court properly concluded that the affirmative action plan applied by the Board to lay off Taxman is invalid under Title VII, and that the district court did not err in calculating Taxman's damages or in dismissing her claim for punitive damages, we will affirm the judgment of the district court.

            TAXMAN v. BD. OF EDUC. OF THE TWP. OF PISCATAWAY,
Nos. 94-5090, 94-5112
STAPLETON, Circuit Judge, Concurring:

            I agree that the Board's non-remedial affirmative action decision is unlawful because non-remedial affirmative action employment decisions cannot pass muster under Title VII. It is unnecessary, however, for the court to decide whether the Board's actions unnecessarily trammel Taxman's interests. Accordingly, I would express no opinion on that issue. I join the remainder of the court's opinion.
United States of America, Sharon Taxman, Plaintiff-Intervenor v. Bd. of Education of the Township of Piscataway,
Sharon Taxman, Appellant v. Bd. of Education of the Township of Piscataway, Nos. 94-5090, 94-5112

SLOVITER, Chief Judge, dissenting, with whom Judges Lewis and McKee join.
            In the law, as in other professions, it is often how the question is framed that determines the answer that is received. Although the divisive issue of affirmative action continues on this country's political agenda, I do not see this appeal as raising a broad legal referendum on affirmative action policies. Indeed, it is questionable whether this case is about affirmative action at all, as that term has come to be generally understood -- i.e. preference based on race or gender of one deemed "less qualified" over one deemed "more qualified." Nor does this case even require us to examine the parameters of the affirmative action policy originally adopted in 1975 by the Board

of Education of the Township of Piscataway (School Board or Board) in response to a state regulation requiring affirmative action programs or the Board's concise 1983 one-page Affirmative Action policy.

Instead, the narrow question posed by this appeal can be restated as whether Title VII requires a New Jersey school or school board, which is faced with deciding which of two equally qualified teachers should be laid off, to make its decision through a coin toss or lottery, a solution that could be expected of the state's gaming tables, or whether Title VII permits the school board to factor into the decision its bona fide belief, based on its experience with secondary schools, that students derive educational benefit by having a Black faculty member in an otherwise all-White department. Because I believe that the area of discretion left to employers in educational institutions by Title VII encompasses the School Board's action in this case, I respectfully dissent.

The posture in which the legal issue in this case is presented is so stripped of extraneous factors that it could well serve as the question for a law school moot court. I emphasize at the outset issues that this case does not present. We need not decide whether it is permissible for a school to lay off a more qualified employee in favor of a less qualified employee on the basis of race, because that did not happen here. Nor need we consider what requirements Title VII may impose on unwilling employers, or how much racial diversity in a high school faculty may be "enough."

Significantly, although the School Board is a public employer, this case does not place before us for decision the limits on race-conscious action imposed on public entities by the Constitution because we are presented with no constitutional claim. Therefore, we must measure the Board's actions under the restraints imposed by Title VII rather than the more demanding ones imposed on government action by the Equal Protection Clause. In this respect the case is similar to that presented in Johnson v. Transportation Agency, Santa Clara County, 480 U.S. 616 (1987), where the Supreme Court noted that even though the defendant was a public employer it would decide the case only under Title VII because no constitutional issue was raised or addressed below. See id. at 620 n.2. The Court also made clear that for purposes of Title VII, the same standard applies to public and private employers, stating that "[t]he fact that a public employer must also satisfy the Constitution does not negate the fact that the statutory prohibition with which that employer must contend was not intended to extend as far as that of the Constitution." Id. at 628 n.6. This was an express rejection of Justice Scalia's contention "that the obligations of a public employer under Title VII must be identical to its obligations under the Constitution." Id. at 627 n. 6; see alsoid. at 649 (O'Connor, J., concurring). Thus it is important to keep in mind that we must measure the Board's action in this case against the same standard we would apply to a private school.

I.

When in May 1989 the School Board was faced with the disagreeable necessity of reducing by one the teaching staff in the Business Department of Piscataway High School, it recognized that reference to the applicable New Jersey law, which provides the roadmap in terms of seniority, would not suffice here because the two teachers had equal seniority. The Board, which has the responsibility of gauging the educational requirements of the students under its charge, would have to resort to its own experience as there were no other prescribed guidelines. It did not then turn to the affirmative action policy to make the decision based on race. There was no built-in quota, expressed or implied, for minority faculty, and Taxman does not so suggest. On the contrary, the Board next considered a variety of undoubtedly relevant factors, any one of which might have tipped the scales in favor of laying off one teacher or the other. Had Taxman been deemed a better teacher than Williams, that alone could have pointed the arrow in her direction. Or, had Williams participated in volunteer activity while Taxman spent her spare time in other activities, that alone could have accounted for Williams' retention. The deposition testimony of several board members who participated in the decision indicates that before the affirmative action policy was considered, a number of other criteria were discussed to break the tie, including work performance, certifications, evaluations, teaching ability, and volunteerism. The two teachers with the least seniority, Taxman and Williams, were determined to be equal with respect to each of these other criteria.

> The Board's Vice President, Paula Van Riper, testified:
> [T]he seniority and the person's qualifications came into play first. If one was more senior than the other, it would have ended right there, if they were of like seniority. From that point it was based on their work performance and their evaluations . . . . There was some consideration given . . . to the various other activities that they did . . . . But certainly the weight would be given to their performance in the classroom. At that point we were told that these are two teachers of equal ability, equal qualifications, I should say. They . . . both[] had good evaluations, they were good teachers, they were supportive of the school district, volunteered in various ways and they . . . had similar certification or like certification and their seniority was the same so therefore they were equal.

Da179-80.

The equal position of both teachers in light of all relevant criteria was also stressed by the Director of Personnel, Gordon Moore, who explained: "we . . . concluded that work history or performance criteria [were] not going to be usable in

breaking the tie, because there was no distinction that could be made."  Da177.

In its opinion, the majority declares the School Board's affirmative action policy unlawful.  An examination of the so-called affirmative action policy reveals that it does nothing more than place before the School Board the need to consider minority personnel among other equally qualifiedcandidates for employment decisions.  Da5, 53.  That this was a necessary reminder in 1975 when the policy was formed can hardly be gainsaid.  I believe that it also was a useful reminder in 1989, when this School Board was faced with this decision, and perhaps even today.

A review of the record makes clear that the Board did not view itself as bound to select Williams for retention by the 1975 affirmative action policy, which speaks only of recommendations, but after discussion and consideration the Board made a discretionary decision to select Williams for retention to further the educational goal of a diverse faculty.  Da72, 94.

The Board members described their purpose in using the goal of diversity underlying the previously adopted affirmative action policy as a factor in the layoff decision as reflecting the "general feeling . . . that it was valuable for the students to see in the various employment roles a wide range of background[s]," Da74, and "the desire to have a diverse teaching staff in the school district."  Da175-76.  It was also intended to send "a very clear message that we feel that our staff should be culturally diverse [for the benefit of the students]" and to "encourage awareness and acceptance and tolerance [of people of all backgrounds]."  Da75.  Thus, the Board took into consideration that if Williams were laid off, the Business Department faculty at the school would be all White.  Da94, 110, 168, 175-176.

II.

It was the Board's decision to include the desire for a racially diverse faculty among the various factors entering into its discretionary decision that the majority of this court brands a Title VII violation as a matter of law.  No Supreme Court case compels that anomalous result.  Notwithstanding the majority's literal construction of the language of Title VII, no Supreme Court case has ever interpreted the statute to preclude consideration of race or sex for the purpose of insuring diversity in the classroom as one of many factors in an employment decision, the situation presented here.  Moreover, in the only two instances in which the Supreme Court examined under Title VII, without the added scrutiny imposed by the Equal Protection Clause, affirmative action plans voluntarily adopted by employers that gave preference to race or sex as a determinative factor, the Court upheld both plans.

In its 1979 decision in United Steelworkers v. Weber, 443 U.S. 193 (1979), the Court held that an agreement between a private company and a union that sought to remedy the historical exclusion of Blacks from skilled craft unions by reserving half the openings in an in-house training program for Blacks did not violate Title VII.  A scarce decade later, it reached a similar

decision in Johnson v. Transportation Agency, Santa Clara County, 480 U.S. 616 (1987), where the plan that the Court upheld authorized consideration of the gender of a qualified applicant as one of various factors for promoting employees into jobs in which women had been significantly underrepresented.

The majority presents Weber and Johnson as if their significance lies in the obstacle course they purportedly establish for any employer adopting an affirmative action program. But, as the Justices of the Supreme Court recognized, the significance of each of those cases is that the Supreme Court sustained the affirmative action plans presented, and in doing so deviated from the literal interpretation of Title VII precluding use of race or gender in any employment action. As Justice Brennan explained in Weber, "It is a 'familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers.'" Weber, 443 U.S. at 201 (quoting Holy Trinity Church v. United States, 143 U.S. 457, 459 (1892)). The Justices dissenting in those cases noted and vigorously objected to the departure. See, e.g., Weber, 443 U.S. at 222, 228 (Rehnquist, J., dissenting) (asserting that the majority "eludes the clear statutory language" and that Kaiser's affirmative action plan is "flatly prohibited by the plain language of Title VII"); Johnson, 480 U.S. at 670 (Scalia, J., dissenting) ("It is well to keep in mind just how thoroughly Weber rewrote the statute it purported to construe . . . Weber disregarded the text of the statute, invoking instead its 'spirit'").

While the majority in this case views the Supreme Court's articulation of the factors that rationalized its upholding of the affirmative action plans in those cases as establishing boundaries, no language in either Weber or Johnsonso states and, in fact, there is language to the contrary. The majority draws the line at the factors used in those cases. In both Weber and Johnson, the Court inquired whether consideration of race in the employment decision was justified by a permissible purpose, and then examined the effect on nonminorities to ascertain whether the action taken "unnecessarily trammel[ed] the interests of the white employees." Weber, 443 U.S. at 208; Johnson, 480 U.S. at 630.

However, it does not follow as a matter of logic that because the two affirmative action plans in Weber and Johnsonwhich sought to remedy imbalances caused by past discrimination withstood Title VII scrutiny, every affirmative action plan that pursues some purpose other than correcting a manifest imbalance or remedying past discrimination will run afoul of Title VII. Indeed, the Court in Weber explicitly cautioned that its holding in that case should not be read to define the outer boundaries of the area of discretion left to employers by Title VII for the voluntary adoption of affirmative action measures. The Court stated:

> We need not today define in detail the line
> of demarcation between permissible and
> impermissible affirmative action plans. It
> suffices to hold that the challenged Kaiser–

> USWA affirmative action plan falls on the permissible side of the line. The purposes of the plan mirror those of the statute. Both were designed to break down old patterns of racial segregation and hierarchy. Both were structured to "open employment opportunities for Negroes in occupations which have been traditionally closed to them."

Weber, 443 U.S. at 208. See also id. at 215-16 (Blackmun, J., concurring)(noting that Kaiser plan "is a moderate one" and that "the Court's opinion does not foreclose other forms of affirmative action").

The majority opinion in Johnson made no attempt to draw the line that Weber left undefined. See Johnson, 480 U.S. at 642 (Stevens, J., concurring) ("I write . . . to . . . emphasize that the opinion does not establish the permissible outer limits of voluntary [affirmative action] programs"). Although Justice O'Connor's concurring opinion argued that permissible purposes under Title VII were limited to those that served to remedy past discrimination, Johnson 480 U.S. at 649, her vote was the sixth in favor of the majority's holding and therefore not crucial to the outcome of the case. It follows that her narrow reading should not be read as constituting the view of the Court. SeeMarks v. United States, 430 U.S. 188, 193 (1977).

The majority here has taken the language of Weber where the Court observed that the plan's purposes "mirrored" those of the statute, and has elevated it to a litmus test under which an affirmative action plan can only pass muster under Title VII if particular language in the text or legislative history of the statute can be identified that matches the articulated purpose of the plan. Nothing in Weber suggests that the Court intended by its "mirroring" language to create such a rigid test.

In Weber, when the Court found that the purposes of the plan were consistent with those of Title VII, it did so by reference not only to the language of the legislative history, but to the historical context from which the Act arose as well. Id. at 201. In Johnson, the Court made no attempt at all to identify language in the legislative history paralleling the particular objectives of the plan it sustained. Thus, even in those cases the Court did not demonstrate the kind of close fit between the plan and the statutory history demanded of the Board in this case.

In Weber, the Court's examination into the purposes of Title VII led it to the conclusion that the Act was designed to promote "the integration of blacks into the mainstream of American society," Weber, 443 U.S. at 202, and the breakdown of "old patterns of racial segregation and hierarchy," id. at 208. The Kaiser affirmative action plan was consistent with these sweeping, broadly stated purposes and hence was sustained.

Of course, I do not disagree with the majority that "Title VII was written to eradicate not only discrimination per se but the consequences of prior discrimination," but I do not

believe that in doing so, Congress intended to limit the reach of Title VII to remedying past discrimination, thereby turning a blind eye toward those social forces that give rise to future discrimination. Title VII, which was a part of the Civil Rights Act of 1964, was fundamentally forward-looking legislation, and that purpose should not be ignored.

The effort to remedy the consequences of past discrimination (such as the "patterns of segregation and hierarchy" referred to in Weber, 443 U.S. at 208), cannot be isolated from the statute's broader aim to eliminate those patterns that were potential causes of continuing or future discrimination. The causal relationship is illustrated by the industry at issue in Weber, where the Court noted that the ongoing imbalance in the hiring of craftworkers had its roots in a history of discrimination that had excluded Blacks from craft unions and thus prevented them from acquiring the necessary qualifications. Id. at 198. In describing the overarching goal toward which the Civil Rights Act was aimed, the House Report spoke of the need to "eliminat[e] all of the causes and consequences of racial and other types of discrimination against minorities." H.R. Rep. No. 914, 88th Cong., 1st Sess., pt. 1, at 18 (1963), reprinted in 1964 U.S.C.C.A.N. 2391, 2393 (emphasis added).

Thus, using the approach taken in Weber and Johnson as a springboard, actions consistent with and in furtherance of the broad statutory goal of eliminating the causes of discrimination are not per se proscribed by Title VII. This generation of young people may not recall that in 1964 racial homogeneity in schools was viewed as among the most fundamental and pernicious aspects of the social pattern undergirding the system of discrimination that the Civil Rights Act sought to dismantle. In the years leading up to the Act's passage, school integration was one of the focal points of the civil rights movement. The Senate Report accompanying the 1972 amendments to Title VII, when it was expanded to cover state and local governments, noted the connection between racial homogeneity in schools and attitudes that lead to discrimination:

> It is difficult to imagine a more sensitive area than educational institutions where the youth of the Nation are exposed to a multitude of ideas and impressions that will strongly influence their future development. To permit discrimination here [among faculty and staff] would, more than in any other area, tend to promote existing misconceptions and stereotypical categorizations which in turn would lead to future patterns of discrimination.

S. Rep. No. 415, 92nd Cong., 1st Sess. 12 (1971)).

In other contexts, the Court has repeatedly recognized racial diversity in the classroom as an important means of combatting the attitudes that can lead to future patterns of discrimination. As Justice Stevens observed in Wygant:

> In the context of public education, it is quite obvious that a school board may reasonably conclude that an integrated faculty will be able to provide benefits to the student body that could not be provided by an all-white, or nearly all-white, faculty. For one of the most important lessons that the American public schools teach is that the diverse ethnic, cultural and national backgrounds that have been brought together in our famous "melting pot" do not identify essential differences among the human beings that inhabit our land. It is one thing for a white child to be taught by a white teacher that color, like beauty, is only "skin deep"; it is far more convincing to experience that truth on a day-to-day basis during the routine ongoing learning process.

476 U.S. at 315 (Stevens, J., dissenting). See also Johnson, 480 U.S. at 647 (Stevens, J., concurring) (noting educational benefit to be derived from racial diversity, "'by dispelling for black and white students alike any idea that white supremacy governs our social institutions'" (quoting Sullivan, The Supreme Court-- Comment, Sins of Discrimination: Last Term's Affirmative Action Cases, 100 Harv.L.Rev. 78, 96 (1986))); Washington v. Seattle School Dist. No. 1, 458 U.S. 457, 473 (1982) ("Attending an ethnically diverse school may help . . . prepar[e] minority children 'for citizenship in our pluralistic society,' while, we may hope, teaching members of the racial majority 'to live in harmony and mutual respect' with children of minority heritage."(citations omitted)); Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 461, 467 (1979) (disapproving policies that "deprive black students of opportunities for contact with and learning from white teachers, and . . . deprive white students of similar opportunities to meet, know and learn from black teachers"); Kromnick v. School District of Philadelphia, 739 F.2d 894, 905 (3d Cir. 1984)("Schools are great instruments in teaching social policy [from which students learn] from the images and experiences that surround them . . . a spirit of tolerance and mutual benefit."), cert. denied, 469 U.S. 1107 (1985).

It is "ironic indeed" that the promotion of racial diversity in the classroom, which has formed so central a role in this country's struggle to eliminate the causes and consequences of racial discrimination, is today held to be at odds with the very Act that was triggered by our "Nation's concern over centuries of racial injustice." Weber, 443 U.S. at 204. Nor does it seem plausible that the drafters of Title VII intended it to be interpreted so as to require a local school district to resort to a lottery to determine which of two qualified teachers to retain, rather than employ the School Board's own educational policy undertaken to insure students an opportunity to learn from a teacher who was a member of the very group whose treatment

motivated Congress to enact Title VII in the first place. In my view, the Board's purpose of obtaining the educational benefit to be derived from a racially diverse faculty is entirely consistent with the purposes animating Title VII and the Civil Rights Act of 1964.

The majority criticizes the Board's use of caselaw construing the Equal Protection Clause in this Title VII case, notwithstanding the Supreme Court's explicit statement in Johnsonthat Title VII's constraint on affirmative action was "not intended to extend as far as that of the Constitution." 480 U.S. at 628 n.6. Nothing in the Court's language in the Johnsonfootnote suggests that we confine it to the particular factual context in which it was made, and the Court is certainly sufficiently articulate to limit its language when so inclined. Nor is the Johnson footnote the only place where the Court signified its understanding that Title VII imposes fewer limitations on employers' voluntary affirmative action than does the Constitution. In Weber, the Court spoke of the "narrowness of [its] inquiry" since the plan did not involve state action and hence did not present an alleged violation of the Equal Protection Clause, Weber, 443 U.S. at 200, and later stated that "Title VII . . . was not intended to incorporate and particularize the commands of the Fifth and Fourteenth Amendments." Id. at 206 n.6 (quoted in Johnson, 480 U.S. at 627 n.6). The latter statement was not made in a discussion that had to do with the "factual predicate" for demonstrating the need for remedial affirmative action, as the majority would confine the similar language in Johnson.

In any event, ultimately it is the Supreme Court rather than this one that will decide whether Title VII allows an employer more discretion to implement race-conscious employment policies than does the Constitution in the employer's effort to promote the underlying goals of the Act. But, in the absence of any dispositive precedent, I believe it would be shortsighted for us to disregard the Supreme Court's statements regarding the advantages of diversity in an educational context when examining the limited use to which diversity was used as a factor in the Board's decision here. In Regents of the University of California v. Bakke, 438 U.S. 265 (1978), where the Court considered a University of California affirmative action program for student admissions, Justice Powell, who announced the judgment of the Court, recognized that a diverse student body leads to a "robust exchange of ideas," id. at 312 (quoting Keyishian v. Board of Regents, 385 U.S. 589, 603 (1967)), and noted that the "essential" elements of academic freedom include the ability not only to select the student body but to determine "who may teach," id. (quoting Sweezy v. New Hampshire, 354 U.S. 234, 263 (1957)).

In Wygant v. Jackson Board of Education, 476 U.S. 267 (1986), the Court held that preferential protection against layoffs afforded to minority teachers by the public school board's affirmative action plan could not be sustained, because the school board's proffered justification for the plan -- that minority teachers were needed to provide role models for minority

students -- was not sufficiently compelling to withstand the strict scrutiny to which it was subject under the Fourteenth Amendment. Id. at 274-276 (Powell, J., joined by Burger, C.J., Rehnquist, J. and O'Connor, J.); id. at 288 (O'Connor, J., concurring); id. at 295 (White, J., concurring). However, Justice O'Connor, in her concurring opinion which was the decisive vote in the Court's holding, specifically distinguished the goal of providing role models from "the very different goal of promoting racial diversity among the faculty," explicitly leaving open the possibility that the latter goal might be sufficiently compelling to pass constitutional muster. Id. at 288 n.*. She also made a favorable reference to Justice Powell's endorsement of diversity in the classroom in Bakke, stating, "although its precise contours are uncertain, a state interest in the promotion of racial diversity has been found sufficiently 'compelling,' at least in the context of higher education, to support the use of racial considerations in furthering that interest." Id. at 286. Her position, plus that of the four dissenting justices, (Marshall, J., dissenting, joined by Brennan & Blackmun, JJ.) (seeking "to achieve diversity and stability for the benefit of all students" through faculty integration is a constitutionally sufficient purpose); id. at 315 (Stevens, J., dissenting) ("'recognition of the desirability of multi-ethnic representation on the teaching faculty'" is a "completely sound educational purpose" (citation omitted)), meant there were five justices in Wygant who approved in general terms the concept that the educational benefit derived from diversity in the classroom can constitute an acceptable justification for affirmative action. See also Britton v. South Bend Community School Corp., 819 F.2d 766, 773 n.1 (7th Cir.) (en banc) (Flaum & Bauer, JJ., concurring) ("Remedying past discrimination is not necessarily the only government purpose sufficiently compelling to justify the remedial use of race. Providing faculty diversity may be a second."), cert. denied, 484 U.S. 925 (1987); Zaslawsky v. Board of Education of Los Angeles, 610 F.2d 661, 664 (9th Cir. 1979)(in equal protection context, purpose of "enhanc[ing] the educational opportunities available to the students by achieving better racial balance in the teaching faculty . . . has been well recognized and approved by the Supreme Court").

I therefore respectfully disagree with the majority, both in its construction of Weber and Johnson as leaving no doors open for any action that takes race into consideration in an employment situation other than to remedy past discrimination and the consequential racial imbalance in the workforce, and in what appears to be its limited view of the purposes of Title VII. I would hold that a school board's bona fide decision to obtain the educational benefit to be derived from a racially diverse faculty is a permissible basis for its voluntary affirmative action under Title VII scrutiny.

                                III.

It is undeniable that, in the abstract, a layoff imposes a far greater burden on the affected employee than a denial of promotion or even a failure to hire. In this case, however, it cannot be said with any certainty that Taxman would

have avoided the layoff had the Board's decision not been race-conscious.  If a random selection had been made, Taxman would have had no more than a fifty-percent chance of not being laid off.  Thus, this was not a situation where Taxman had a "legitimate and firmly rooted expectation" of no layoff.  Johnson, 480 U.S. at 638; cf. Mackin v. City of Boston, 969 F.2d 1273, 1278 (1st Cir. 1992) (where, even in absence of affirmative action scheme, White applicants "could not reasonably have felt assured that they would be appointed," plan did not disturb any legitimate expectations), cert. denied, 113 S.Ct. 1043 (1993).

This differs from the situation of an employee who is next in line for a promotion by the objective factor of seniority.  Taxman's qualifications were merely equal to those of her competitor for this purpose.  In Johnson the Court held that because there were six other employees who also met the qualifications for the job, Johnson had no "entitlement" or "legitimate firmly rooted expectation" in the promotion, even though he had scored higher than the others on the qualifying test.  See Peightal v. Metropolitan Dade County, 940 F.2d 1394, 1408 (11th Cir. 1991) (affirmative action plan valid under Title VII where it never requires hiring unqualified person over qualified person), cert. denied, 502 U.S. 1073 (1992); cf. United States v. Paradise, 480 U.S. 149, 177-78 (same under equal protection).  Moreover, just as the plaintiff in Johnson remained eligible for promotion in the future, 480 U.S. at 638, Taxman retained recall rights after her layoff, and did in fact regain her job.

The majority relies in part on Wygant, where the Supreme Court found that the use of faculty layoffs to meet affirmative action goals in a public school system imposed too heavy a burden on White employees.  Wygant, 476 U.S. at 282-83.  However, the Court's holding that the Wygant plan was not "narrowly tailored" for purposes of an equal protection challenge is not dispositive of the present inquiry as to whether a plan "unnecessarily trammels" the rights of White employees for Title VII purposes.  Not only was a different legal standard applicable but Wygant is also distinguishable because the Wygant plan caused nonminority teachers with more seniority to be laid off in order to retain minority teachers with less seniority.  Wygant, 476 U.S. at 282.  The Wygant plan actually caused teachers to be laid off who, in the absence of the plan, would have had no risk of layoff.  That burden -- increasing the chance of layoff from zero to one hundred percent -- is significantly heavier than that imposed on Taxman, who would have had a substantial chance of being laid off even absent any consideration of diversity.

Only three members of the Court subscribed to language in the plurality opinion in Wygant suggesting that the use of layoffs to accomplish affirmative action goals will never survive strict scrutiny.  See 476 U.S. at 284.  The two concurring justices did not go that far.  See id. at 293 (O'Connor, J., concurring) ("[n]or is it necessary, in my view, to resolve the troubling question[] whether any layoff provision could survive strict scrutiny"); id. at 295 (White, J., concurring) (confining his conclusion to the specifics of the layoff policy at issue).

Therefore I do not read Wygant to hold that no race-conscious layoff decision will survive Title VII scrutiny.

The majority gives a similarly narrow reading to Weberand Johnson, construing these cases to impose a wooden, "unequivocal" requirement that all affirmative action plans must be explicitly temporary in order to be valid. Majority Typescript at 40. In fact, the Johnson plan itself "contain[ed] no explicit end date," Johnson, 480 U.S. at 639, and the Court indicated that only certain plans that are particularly burdensome on nonminorities in other respects need necessarily be expressly temporary. "Express assurance that a program is only temporary may be necessary if the program actually sets aside positions according to specific numbers." Johnson, 480 U.S. at 639-40 (emphasis added). The Supreme Court's references to the temporary duration of the plans at issue in Weber and Johnson are more accurately construed as an understandable effort to assure that race does not become a permanently embedded consideration in employment decisions. The significant consideration is whether there has been an effort "to minimize the effect of the program on other employees," not whether the underlying policy is set to run a specified number of years. Johnson, 480 U.S. at 640.

In the situation before us, I see ample basis from which to deduce an effort to minimize the effect of the Board's affirmative action policy on non-minority employees. One such aspect is the discretionary nature of the policy. The Board is free not to apply the policy, even to break a tie. Also significant is the infrequency with which the Board has resorted to the policy. Although it may be of little comfort to Taxman, the fact that this is the first time in the twenty years since the policy was adopted that it has been applied to a layoff decision demonstrates the minimum impact on White teachers as a whole. And since, by its own terms, it only applies in the rare instances in which two candidates are of different races but equal qualifications and the department in question is not already diverse, it is likely that it will continue to be infrequently applied. See District Court's Final Judgment and Contingent Order, entered February 15, 1994 at 2 (denying request for broad injunction because "[t]here is, in the court's view, no likelihood that the conduct at issue in this case will recur").

In this connection, I deem it further evidence of the Board's interest in minimizing any adverse effect on non-minorities that it has not defined diversity by any specific numerical goal. Although the majority regards that as a major concern, I view the lack of any such figure as an indication that the Board's plan does not impose a fixed quota with the rigidity attendant thereto.

It is not the province of this court to intrude into what is essentially an educational decision. Once we have determined that promoting faculty diversity for educational purposes can be a valid justification for an appropriately limited race-conscious action, it is not our role to second-guess the judgment of educators as to the level of diversity that produces the educational environment they deem appropriate. The Board's action is an attempt to create an educational

environment that will maximize the ability of students to address racial stereotypes and misconceptions born of lack of familiarity.  I find it difficult to believe that an Act that was given birth by the tensions of the civil rights era precludes it from doing so under the facts before us here.  Given the record before us, the consequence of the narrow reading that the majority gives Weber and Johnson is the very irony that the Supreme Court said would result from interpreting this civil rights statute in a manner divorced from its historic context. As the Court noted in Weber:

> [i]t would be ironic indeed if a law triggered by a Nation's concern over centuries of racial injustice and intended to improve the lot of those who had "been excluded from the American dream for so long," 110 Cong. Rec. 6552 (1964) (remarks of Sen. Humphrey), constituted the first legislative prohibition of all voluntary, private, race-conscious efforts to abolish traditional patterns of racial segregation and hierarchy.

Weber, 443 U.S. at 204.

I return to the question raised at the outset:  whether Title VII requires that the Board toss a coin to make the layoff selection between equally situated employees.  In his opinion for the majority in Weber, Justice Brennan noted the distinction made by Congress between requiring and permitting affirmative action by employers.  See Weber, 443 U.S. at 205-06.  He deemed it important that, while Congress explicitly provided that Title VII should not be interpreted to require any employer to grant preferential treatment to a group because of its race, Congress never stated that Title VII should not be interpreted to permit certain voluntary efforts.

In this case, the majority gives too little consideration to the tie-breaking method that its holding will impose on the Board.  It points to no language in Title VII to suggest that a lottery is required as the solution to a layoff decision in preference to a reasoned decision by members of the School Board, some of whom are experienced educators, that race of a faculty member has a relevant educational significance if the department would otherwise be all White.  While it may seem fairer to some, I see nothing in Title VII that requires use of a lottery.

Because I cannot say that faculty diversity is not a permissible purpose to support the race conscious decision made here and because the Board's action was not overly intrusive on Taxman's rights, I would reverse the grant of summary judgment for Taxman under Title VII and direct that summary judgment be granted to the School Board.

Taxman v. Bd. of Educ. of the Twp. of Piscataway, 94-5090/5112


SCIRICA, Circuit Judge, dissenting, with whom Chief Judge Sloviter joins.

While I find much with which I agree in the majority's opinion, I am constrained to express my disagreement because I believe education presents unique concerns.

In University of California Regents v. Bakke, 438 U.S. 265 (1978), Justice Powell recognized that "the 'nation's future depends upon leaders trained through wide exposure' to the ideas and mores of students as diverse as this Nation of many peoples." Id. at 313 (citation omitted). As he noted, in the university: "[A] great deal of learning occurs . . . through interactions among students of both sexes, of different races, religions, and backgrounds . . . ." Id. at 312-13 n.48 (citation omitted). Eighteen years later, the wisdom of this statement resonates as strongly as ever. When added to a university's high academic standards, this exposure constitutes a formidable educational experience.

In this case, the Piscataway Board of Education concluded that a diverse faculty also serves a compelling educational purpose; namely, it benefits students in the business department by exposing them to teachers with varied backgrounds. The Board implemented a program that, in limited circumstances, allows consideration of race as a factor in school employment decisions. The Board did not countenance the layoff of a more-qualified teacher in the place of a less-qualified one. It did not prefer teachers junior in seniority to those with more experience. Rather it concluded that when teachers are equal in ability and in all other respects--and only then--diversity of the faculty is a relevant consideration.

I do not believe Title VII prevents a school district, in the exercise of its professional judgment, from preferring one equally qualified teacher over another for a valid educational purpose.

Accordingly, I respectfully dissent.


United States v. Bd. of Educ. of the Twp. of Piscataway
Sharon Taxman v. Bd. of Educ. of the Twp. of Piscataway
Nos. 94-5090 and 94-5112


LEWIS, Circuit Judge, with whom Judge McKee joins, dissenting.

I join in Chief Judge Sloviter's dissent, as well as those of each of my dissenting colleagues.

I would only add that we should be mindful of the effects the majority's approach will impose upon legitimate, thoughtful efforts to redress the vestiges of our Nation's history of discrimination in the workplace and in education; efforts which, in seeking to achieve pluralism and diversity, have helped define and enrich our offices and institutions, and which were intended to open, and keep open, the doors of opportunity to those who have "been excluded from the American dream for so long." See 110 Cong. Rec. 6552 (1964) (excerpted from Sen. Humphrey's remarks). This, after all, is what I had always thought Title VII was intended to accomplish. More importantly, as Chief Judge Sloviter notes, these goals are

plainly supported by the statute's legislative history.  Thus, while the majority holds that Title VII only allows race to be considered in remedying a history of intentional discrimination or a "manifest imbalance," I believe this conclusion is fundamentally at odds with the overriding goals of the statute. And the real-life impact of the majority's unprecedented construction of Title VII is readily apparent when one contemplates the myriad of difficult decisions that employers across the nation face everyday.

Somewhere out there in the real world, for example, there is a law firm with a racial make-up (a workforce) akin to Piscataway High School's; a firm which lacks a history of intentional discrimination in hiring but, due to economic concerns, must decide between retaining one of two attorneys -- the first and only black associate to work in its prestigious anti-trust department, or his equally qualified white counterpart.  The firm's management committee may decide that to lay-off the black associate would be an unwise and potentially damaging business decision because it would negate the large investment of time, effort and money spent trying to recruit and retain minority lawyers.  In other words, the firm may believe that diversity would be good for business and good for itself, so, everything else being equal, it decides to lay-off the white associate.

In a situation such as this, the firm's reliance upon race as one among many factors in making its decision is the type of management prerogative which is totally consistent with the goals and underlying purpose behind Title VII.  See Weber, 443 U.S. at 206 (noting that Title VII's legislative history demonstrates that the statute was not intended to place unnecessary limits upon "management prerogatives").  After it reads the majority's decision, however, it seems clear that the firm will be forced to disregard its own better business judgment, forsake its recent recruiting successes among minorities and, I suppose, flip a coin on its own future as well as the young associates', all in order to avoid the specter of Title VII liability and an enormous damage award.

At times, a private college, with a handful of minorities on its faculty and with no history of intentional discrimination in hiring, is faced with the unenviable task of deciding which of two young associate professors with indistinguishable records to grant tenure in a particular department.  The only difference between the two is that one is white and the other is Latino.  After reviewing all of the other factors and finding them in equipoise, the tenure committee may decide to offer the position to the Latino associate professor because there has never been a tenured Latino professor in any department at the college, and because it believes his presence at the college will be a significant benefit to the entire student body.  As with the law firm, this decision is entirely consistent with Title VII because it is motivated by some of the same concerns that lead Congress to enact the statute.  SeeWeber, 443 U.S. at 208 (noting that the plan was valid under
Title VII in part because the "purposes . . . mirror those of the

statute").

But again, the majority's rationale will thwart the college's ability to rely upon its independent judgment in deciding what is in the best interests of the students whom it is charged with educating. Instead, according to the majority, that important judgment is better exercised (in this case may only be exercised) by resorting to a coin-flip.

One could cite countless other examples of the significant and ultimately counterproductive effects of the majority's narrow construction of Title VII, but suffice it to say that in my view, Title VII was not enacted to prevent the thoughtful, deliberative processes employed by such a law firm or college. I believe that in this case the school board's decision to consider race, among other factors, in an attempt to ensure a diverse faculty for its students was in furtherance of Title VII's goal of breaking-down "existing misconceptions and stereotypical categorizations which in turn lead to future patterns of discrimination." See S. Rep. No. 415, 92nd Cong., 1st Sess. 12 (1971). Accordingly, its decision was as legal as it was laudable.

I believe the majority's decision eviscerates the purpose and the goals of Title VII. I respectfully dissent.Taxman v. Board of Education of the Twp. of Piscataway Nos. 94-5090 & 94-5112

McKEE, Circuit Judge, dissenting, with whom SLOVITER, Chief Judgeand LEWIS, Circuit Judge join.

I join each the opinions of my dissenting colleagues, but write only to elaborate upon what I consider to be important considerations in our analysis. "The prohibition against racial discrimination in §§ 703(a) and (d) of Title VII must [ ] be read against the background of the legislative history of Title VII and the historical context from which the Act arose." United Steelworkers v. Weber, 443 U.S. 193, 201 (1979).

We have now come full circle. A law enacted by Congress in 1964 to move this country closer to an integrated society and away from the legacy of "separate but equal" is being interpreted as outlawing this Board of Education's good faith effort to teach students the value of diversity. The selection of Ms. Williams meant that the business department would retain the only Black teacher tenured in that department in anyone's memory. Board President Theodore H. Kruse testified that it was his "general feeling . . . that it was valuable for the students to see in the various employment roles a wide range of background[s]" and that diversity "was also valuable to the work force and in particular to the teaching staff." Da74. Kruse further explained that "by retaining Mrs. Williams it was sending a very clear message that we feel that our student population is culturally diverse and there is a distinct advantage to students . . . to be made . . . more aware, more tolerant, more accepting, more understanding of people of all background[s]." Da75. I can not believe that Title VII was intended to strike down such an action.

As Chief Judge Sloviter points out, the majority's ruling is based upon an interpretation of United Steelworkers v.

Weber, 443 U.S. 193 (1979), and Johnson v. Transportation Agency, 480 U.S. 616 (1987) that conflicts with the language used in those cases.  See Typescript at 10-11 (Sloviter, C.J., dissenting).  The majority's conclusion that affirmative action plans not limited to attempts to remedy past discrimination run afoul of Title VII simply ignores the legislative history that Weber and Johnson require us to consider.

> Given the interpretation of [Title VII] the Court adopted in Weber, I see no reason why the employer has any duty, prior to granting a preference to a qualified minority employee, to determine whether his past conduct might constitute an arguable violation of Title VII.  Indeed, in some instances the employer might find it more helpful to focus on the future.  Instead of retroactively scrutinizing his own or society's possible exclusions of minorities in the past to determine the outer limits of a valid affirmative-action program -- or indeed, any particular affirmative-action decision -- in many cases the employer will find it more appropriate to consider other legitimate reasons to give preferences to members of under-represented groups. Statutes enacted for the benefit of minority groups should not block these forward-looking considerations.

480 U.S. at 646-47 (Stevens, J., concurring).  This is particularly true in the field of education where young people are developing opinions and beliefs that will determine their attitudes as citizens, and this country's future.  Under such circumstances, the School Board considered Ms. Williams' race as a factor that was weighed in the balance with all other factors in making a very difficult choice between two equally fine teachers.

Similar consideration of an employee's sex has been upheld in Johnson.  There, the Court stated:

> We therefore hold that the Agency appropriately took into account as one factor the sex of [the employee] in determining that she should be promoted to the road dispatcher position.  The decision to do so was made pursuant to an affirmative action plan that represents a moderate, flexible, case-by-case approach to effecting a gradual improvement in the representation of minorities and women in the Agency's work force. Such a plan is fully consistent with Title VII, for it embodies the contribution that voluntary employer action can make in eliminating the vestiges of discrimination in the workplace.

480 U.S. at 641-42.  Thus, I disagree with the majority's

conclusion that "there is no congressional recognition of diversity as a Title VII objective requiring accommodation." Maj. Op. at 24.

To be sure, I can understand the majority's concern over allowing race to be a factor in any decision. History loudly proclaims the evil that can spring from such practices, and it is sometimes all too easy to simply ignore that evil when the practice appears to be driven by a benign purpose. However, I do not believe that what the Board of Education was attempting to do here, nor the individualized manner in which it was attempting to do it, runs afoul of a Congressional enactment cloaked in the legislative history recounted herein, and in the opinions of my colleagues.

Not that long ago the President's Commission on Civil Disorders (the "Kerner Commission") warned that "[o]ur nation is moving toward two societies, one black, one white -- separate and unequal." Report of The National Advisory Commission on Civil Disorders, at 1 (March 1, 1968). Some may view the Board's efforts here as yet another push in that direction. Indeed, if we were writing upon a clean slate that would no doubt be true. But of course, we do not do that. The shadows and images that moved Congress to enact Title VII in 1964 are already etched into our slate, and they define the reality that should guide our analysis. The Board has responded to those shadows with an action that is a narrow, individualized and reasoned attempt to foster respect for diversity. Because that is consistent with the purposes of Title VII, I respectfully dissent.